# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## TERRE HAUTE DIVISION

| | | |
|---|---|---|
| ABDUL-AZIZ RASHID MUHAMMAD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:15-cv-00228-JMS-MJD |
| | ) | |
| A. RUPSKA, | ) | |
| LCDR KIMBERLY KLINK, | ) | |
| LIEUTENANT CHRISTOPHER BLILA, | ) | |
| HEATHER ATTERBURY, | ) | |
| KAYLA MILLER, | ) | |
| TIMOTHY TABOR, | ) | |
| T. BAILEY, | ) | |
| | ) | |
| Defendants. | ) | |

**Entry Discussing Plaintiff's and Federal Defendants'
Cross Motions for Summary Judgment**

Plaintiff Abdul-Aziz Rashid Muhammad filed this civil action alleging that he was denied constitutionally adequate medical care while incarcerated at the federal prison in this district between November 20, 2012, and October 21, 2013. Claims against seven defendants remain for resolution.[1] Muhammad alleges that defendants Andrew Rupska, Kimberly Klink, Christopher Blila, Timothy Tabor, and Thomas Bailey were deliberately indifferent to Muhammad's serious medical needs. Muhammad suffers from hepatitis C, a torn rotator cuff in his shoulder, artery disease of his legs and feet (with associated neuropathy), and damaged vertebrae in his neck and back. In addition, Muhammad alleges that Heather Atterbury and Kayla Miller were deliberately

---

[1] See Supplemental Statement of Claims which is the operative pleading in this action. Dkts. 10 (Statement of Claims) and 11 (Screening Order).

indifferent to Muhammad's serious medical need for orthopedic shoes to treat neuropathy and artery disease in his feet. All other claims and defendants have been dismissed.[2]

Each party seeks resolution of this action through the entry of summary judgment. On December 4, 2017, Muhammad filed motion for summary judgment and brief in support. Muhammad argues that the undisputed record reflects that the defendants were deliberately indifferent to his serious medical needs. In response, on January 23, 2018, Defendants Kimberly Klink, Christopher Blila, Andrew Rupska, Heather Atterbury, Kayla Miller, Timothy Tabor, and Thomas Bailey (collectively, the "federal defendants") filed a cross motion for summary judgment, brief in support and response to plaintiff's motion for summary judgment, and the notice required by Local Rule 56-1. They argue that Klink and Blila, commissioned officers of the United States Public Health Service, are entitled to absolute immunity; that claims arising before July 27, 2013, are barred by the applicable statute of limitations, and that Muhammad cannot establish deliberate indifference against the remaining federal defendants. The cross motions are now fully briefed.

For the reasons explained below, Muhammad's motion for summary judgment, dkt [111], is **denied** and the federal defendant's motion for summary judgment, dkt [116], is **granted.**

## I. Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

---

[2] See Entry Discussing United States' Motion for Summary Judgment, dkt. 88, and Entry Granting Summary Judgment in Favor of Defendant Ashley Matchett, dkt. 122 and 125 (Entry denying plaintiff's objections). Muhammad's May 23, 2018, "motion objecting to defendant's brief in support of federal defendants' cross motion for summary judgment and response to plaintiff's motion for summary judgment" reflects that Muhammad may be attempting to add additional claims. For example he appears to raise claims based on retaliation, inappropriate transfer, and a failure to treat pain. See dkt. 135. No new claims may be raised during the course of summary judgment briefing and these claims are disregarded.

as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome-determinative. *Montgomery v. American Airlines Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws

all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them.[3] *Grant v. Trustees of Indiana University,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003). Cross-motions for summary judgment are treated separately. *McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 504 n. 4 (7th Cir. 2008). When cross-motions for summary judgment are filed, courts "look to the burden of proof that each party would bear on an issue of trial; [courts] then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).

---

[3] Muhammad's summary judgment brief points out that his original Complaint filed July 27, 2015, was signed under the penalty of perjury. The Seventh Circuit has held that a complaint "is the equivalent of an affidavit for summary judgment purposes" when it is verified under penalty of perjury and based on personal knowledge. *Locke v. Haessig*, 788 F.3d 662, 665 (7th Cir. 2015) (citing *Devbrow v. Gallegos,* 735 F.3d 584, 587 (7th Cir. 2013)). Accordingly, Muhammad's complaint shall be treated as an affidavit, but it will be considered only to the extent that he specifically cited to it in support of a factual assertion in his briefing. The Court will not scour the record for facts to support Muhammad's claims.

## II.  Undisputed Facts

The following material facts are undisputed.

### A. Muhammad

From November 20, 2012, through October 21, 2013, Muhammad was incarcerated at FCI Terre Haute, which is the medium security facility within the Federal Correctional Complex in Terre Haute, Indiana ("FCC Terre Haute").

### B.  Kimberly Klink

Kimberly Klink is commissioned as a Commander with the United States Public Health Service ("PHS"). At all times relevant to the allegations in Muhammad's Complaint, she served as the Assistant Health Services Administrator ("AHSA").  Klink has been the AHSA at FCI Terre Haute since May 2012. Any and all actions that Klink took with respect to Muhammad and the allegations in this lawsuit were undertaken within the scope of her employment with the Bureau of Prisons ("BOP") and in accordance with applicable federal laws and BOP policy. As AHSA, Klink was responsible for the administrative aspects of the Health Services Department and her duties included coordinating physical maintenance of the department, addressing personnel and human relations matters, handling fiscal and budgetary related matters, supervising non-clinical staff, and ensuring records retention within applicable policies. As such, Klink was not responsible for the clinical treatment of inmates and did not provide medical treatment to Muhammad.

### C.  Christpoher Blila

Christopher Blila is commissioned as a Lieutenant Commander with the PHS and has been employed by PHS since October 23, 2006. From October 23, 2006, through December 29, 2017, Blila was assigned to FCC Terre Haute. Blila has been a licensed Family Nurse Practitioner

("FNP") since May 2011. Any and all actions that Blila took with respect to Muhammad and the allegations in this lawsuit were undertaken within the scope of his employment with the BOP.

## D. Andrew Rupska

From April 7, 2013, through November 26, 2017, Andrew Rupska was the Health Services Administrator ("HSA") for FCC Terre Haute. In his capacity as HSA, Ruspka did not provide direct medical care to inmates unless a medical emergency arose. Rather, he was responsible for implementing and directing the administration of the Health Services Department. Accordingly, his duties included supervising administrative personnel and overseeing staff scheduling, fiscal management, and records management.

Prior to becoming HSA, Rupska was the AHSA at FCI Terre Haute from July 2000 to April 7, 2013. In his prior role as AHSA, Rupska was responsible for the administrative aspects of the Health Services Department. His duties included coordinating physical maintenance of the department, addressing personnel and human relations matters, handling fiscal and budgetary related matters, supervising non-clinical staff, including the Health Services Assistants, and ensuring records retention within applicable policies. As such, as AHSA, Rupska was not responsible for the clinical treatment of inmates and did not provide medical treatment to Muhammad.

## E. Heather Atterbury and Kayla Miller

Heather Atterbury has been employed by the BOP since January 17, 2012, while Kayla Miller has been employed by the BOP since February 11, 2013. At the time of the allegations made in Muhammad's Complaint, Atterbury and Miller were employed as Health Services Assistants at FCC Terre Haute.

As Health Services Assistants, Atterbury and Miller are responsible for assisting with the maintenance of budgeting data for the Health Services Department, scheduling inmates for in-house appointments with community hospital and contract consultants, assisting with the resolution of billing discrepancies, and supporting the HSA and AHSA. The position of Health Services Assistant is considered a non-clinical position, and Health Services Assistants are not involved in clinical decisions made by clinical staff. Thus, neither Atterbury nor Miller were involved in the clinical decisions regarding Muhammad's treatment. The Health Services Assistants order supplies and equipment, but they are not permitted to do so unless a clinician finds such items medically necessary and issues an order for their purchase.

**F. Muhammad's Medical Care at FCI Terre Haute after July 27, 2013**

On July 31, 2013, Muhammad was seen off-site by Dr. Pradeep Narotam at Union Hospital Neuroscience, who diagnosed him with lumbar stenosis and recommended L2-S1 transfacet fixation surgery.

Muhammad was seen by Dr. Orman, a cardiologist, on August 7, 2013. Muhammad also underwent a rest/stress single isotope PET myocardial perfusion imaging on this day.

Timothy Tabor, a Physician Assistant ("PA"), evaluated Muhammad at a Sick Call Encounter on August 13, 2013; Muhammad was complaining of breakdown of bilateral shins, varicose veins of bilateral legs, and not yet receiving medical shoes for neuropathy. PA Tabor submitted consultation requests for podiatry to have Muhammad scheduled for a LEAP foot exam and evaluation of bilateral foot neuropathy, for "Specialty Procedure - In house" to have him scheduled for a bilateral Ankle-Brachial Index ("ABI"), and for vascular surgery for surgical evaluation of bilateral varicose veins. On August 14, 2013, the Utilization Review Committee

("URC") approved Muhammad for a consultation with "specialty," but denied a consultation with podiatry, determining that a review of his condition by a podiatry consultant was not warranted at that time.

Muhammad submitted an electronic message to Kayla Miller, Health Services Assistant, on August 19, 2013, asking about medical shoes and stockings. Miller responded the same day, telling him that she had not heard about the medical shoes and addressing his inquiry regarding stockings.

On August 19, 2013, after receiving the faxed documents regarding Muhammad's recent cardiac stress test, FNP Blila submitted a cardiology consultation request to schedule cardiac catheterization. Blila changed this consultation request to in-house follow up to determine if the cardiologist wanted to proceed with a heart cath on September 4, 2013. The URC approved the consultation request with cardiology on September 11, 2013.

Muhammad was seen at Sick Call on September 6, 2013, complaining that his medical shoes had worn out and were causing foot problems. Dr. Roger Bailey evaluated Muhammad on September 19, 2013, agreeing that one of Muhammad's diagnoses included peripheral neuropathy and indicating that he felt Muhammad had a medical need for medical shoes.[4]

On September 23, 2013, FNP Blila submitted a neurosurgery consultation request to schedule for L2-S1 transfacet fixation, DLL L2-L4. The URC referred this request to the North Central Regional Office for approval or denial on September 26, 2013.

Muhammad was seen in-house for an ABI test on September 25, 2013. On October 3, 2013, Physical Therapist Ashley Matchett evaluated Muhammad to reassess his need for medical shoes.

---

[4] Dr. Roger Bailey is not a defendant in this action.

Upon examination, PT Matchett determined that Muhammad did have some risk factors for skin ulceration so medical shoes appeared indicated. The results from the ABI test, which were faxed on October 7, 2013, indicated that Muhammad's left ABI was normal and his right ABI was in rest pain range; it was recommended that MRA[5] or CTA[6] correlation be considered.

On October 7, 2013, Muhammad was seen in house by Dr. Orman, a cardiologist, for follow up. Dr. Orman recommended follow up in six months, and a consultation request for cardiology was submitted. The next day, Dr. Orman indicated that Muhammad was clear for travel. The URC approved the cardiology consultation request on October 9, 2013.

Muhammad was evaluated by Dr. Ulrich, an orthopedist, for right shoulder pain on October 10, 2013. Dr. Ulrich recommended right shoulder arthroscopy and follow up afterward; a consultation request for orthopedic surgery was submitted.

Muhammad was transferred out of FCI Terre Haute on October 21, 2013.

**G. Expert Opinion of Dr. John D. Baldea**

Dr. John D. Baldea, MD, a family medicine physician employed by Indiana University Health and Indiana University School of Medicine, reviewed the medical care provided to Muhammad by BOP medical staff for his Hepatitis C, torn rotator cuff, peripheral vascular disease, and damaged vertebrae. He also specifically considered the provision of custom medical shoes.

---

[5] "An MRA is a test that lets your doctor see inside your blood vessels -- your arteries and veins. MRA stands for Magnetic Resonance Angiogram or MR Angiography. Your doctor may ask you to get one in order to look for and treat problems with your blood vessels." *See* https://www.webmd.com/heart-disease/what-is-mra#1 (last visited June 19, 2018).

[6] "More detailed than an X-ray, a computerized tomography angiography (CTA) uses X-rays and computer technology to produce cross-sectional images of the carotid arteries." *See* https://www.webmd.com/heart-disease/qa/how-is-computerized-tomography-angiography-cta-used-to-diagnose-carotid-artery-disease (last visited June 19, 2018).

As to each health care concern, Dr. Baldea opined that the care that was provided was timely, appropriate, and within the standard of care.

### 1. Hepatitis C

Regarding Muhammad's treatment for hepatitis C, Dr. Baldea reviewed Muhammad's history of hepatitis C while in BOP custody, noting—as relevant to this action—that Dr. Bailey provided a brief review of this history in his note dated December 3, 2012. In particular, Dr. Bailey stated that Muhammad was diagnosed with Hepatitis C in 2001, and was treated with interferon and ribavirin at a previous correctional facility. Unfortunately, that treatment failed. Dr. Bailey noted that Muhammad's liver enzymes were normal for the past three tests and that they would continue to track laboratory studies and liver ultrasounds. The medical record further reflected that on January 13, 2014, Dr. Laybourn and Muhammad discussed Hepatitis C again after Muhammad requested triple medication therapy for his chronic infection. Dr. Laybourn noted that Muhammad did not qualify for treatment. After a review of Muhammad's treatment for hepatitis C by the BOP medical staff in general, Dr. Baldea opined that, based on the recurrent blood, ultrasound, and biopsy result ranging from normal to mildly abnormal, "Muhammad did not meet the criteria to receive triple medication therapy for Hepatitis C, as he requested" and that the conservative treatment provided to Muhammad for his chronic Hepatitis C infection was reasonable, appropriate, and in keeping with the standard of care. Dkt. 116-57 at p. 2.

### 2. Torn Rotator Cuff

Dr. Baldea recounted Muhammad's treatment for his right shoulder, dating back to March 2011, through his evaluation by Dr. Ulrich, the orthopedic surgeon who diagnosed him with a rotator cuff tear and recommended arthroscopic surgery. According to Dr. Baldea, "[t]hroughout

his medical record, Mr. Muhammad was treated for his right shoulder pain caused by osteoarthritis and a rotator cuff tear with numerous conservative measures, including oral anti-inflammatory pills, physical therapy, home exercise instructions, gabapentin, brief courses of oral opioid analgesics, and subacromial corticosteroid injections. In addition, special requests were made to accommodate his shoulder pain and decreased function, including work restrictions and instruction to cuff in front, or double-cuff in back. Overall, the treatment provided to Mr. Muhammad for his right shoulder pain and rotator cuff tear was appropriate, reasonable, and in keeping with the standard of care." Dkt. 116-57 at p. 3.

### 3. Peripheral Vascular Disease

Dr. Baldea also reviewed the general treatment that the BOP medical staff provided to Muhammad for his peripheral vascular disease, finding it appropriate, reasonable, and within the standard of care. Specifically, Dr. Baldea noted that "Muhammad was provided numerous forms of conservative therapy for his peripheral vascular disease, including instructions to lose weight and increase activity, and compression stockings that were used intermittently and replaced on a regular basis . . . [and] was given work and activity restrictions, gabapentin for leg pain, and medical shoes." Dkt. 116-57 at p. 4.

### 4. Lumbar Spine

Next, Dr. Baldea chronicled the treatment Muhammad received for "damaged vertebrae in his neck and back," dating back to October 2008 until December 2015. As relevant to his time at FCC Terre Haute, Dr. Baldea noted that Muhammad received lumbar spine x-rays on March 12, 2013, following a fall from his bunk, and underwent an MRI of his lumbar spine on April 15, 2013, which showed severe spinal stenosis at the L2 through S1 levels with disc herniations, including

foraminal stenosis and lateral recess compromise. He was later seen by neurosurgeon Dr. Narotam, who recommended L2-S1 transfacet fixation surgery. Dr. Baldea then opined that Muhammad received conservative medical treatment for his back pain and degenerative joint disease of his spine, including oral anti-inflammatory pills, oral corticosteroid pills, oral gabapentin, rare and brief courses of opioid pain medicine, intramuscular ketorolac injections, physical therapy, work restrictions, and medical shoes. Dr. Baldea found that "the medical care provided to him for his lumbar spine degenerative joint disease and spine pain was appropriate, reasonable, and within the standard of care." Dkt. 116-57 at p. 5.

### 5. Medical Shoes

Dr. Baldea noted that Muhammad was provided with numerous pairs of custom orthopedic medical shoes to help with his neuropathic pain and peripheral vascular disease. While at FCI Terre Haute, Muhammad was evaluated on May 2, 2013, by Ashley Matchett, a physical therapist. Matchett saw no medical reason from a physical therapy standpoint for Mr. Muhammed to need any type of medical footwear. He did not have any deformity of the foot or other condition causing any gait disturbance that would require medical footwear from a physical therapy perspective. Matchett did note that Muhammad has documentation of peripheral neuropathy. Dkt. 79-2.[7] Dr. Baldea opined that Matchett was following an established protocol with defined treatment criteria to determine whether Muhammad would qualify for medical shoes. Dkt. 116-57 at p. 6.

---

[7] Dr. Baldea's testimony is that Matchett "initially thought that [Muhammad] did not qualify for medical shoes." Dkt. 116-57. This testimony is misleading. Dr. Baldea is not in a position to testify as to what Matchett thought. Accordingly, the court relies on Matchett's evaluation report. Dkt. 79-2.

Muhammad was seen by Dr. Bailey on September 19, 2013. At that time, Dr. Baily noted that Muhammad would qualify for medical shoes due to peripheral neuropathy in this legs.

Dr. Baldea agreed that Muhammad would qualify for medical shoes to help with his symptoms and that the duration and frequency in which custom orthopedic medical shoes were supplied to Muhammad was appropriate, reasonable, and within the standard of care. Dkt. 116-57 at p. 5.

### 6. General Impression

Dr. Baldea opined that Muhammad received frequent, appropriate, and evidence-based medical care from the BOP medical staff, which was within the standard of care. Specifically, Dr. Baldea noted that the medications and treatment modalities prescribed to Muhammad were appropriate and effective for the conservative symptomatic treatment of his multiple comorbidities. He further noted that Muhammad received annual liver ultrasound studies, a liver biopsy, and frequent blood work to evaluate the status of his chronic hepatitis C; oral medications, physical therapy consults, occupational therapy consults, corticosteroid injections, and specialist consultations to evaluate and treat his rotator cuff tear and degenerative joint disease of his spine; and numerous diagnostic tests, specialist consultations, wound care consults, regular replenishment of compression stockings and custom medical orthopedic shoes to evaluate and treat his peripheral vascular disease. According to Dr. Baldea, Muhammad also demonstrated numerous occurrences of behavior that reflected noncompliance with his treatment plan, which could have adversely affected his symptoms and healing potential.

**III. Discussion**

**A. Muhammad's Motion for Summary Judgment**

Muhammad argues that he is entitled to summary judgment. In response, the federal defendants point out that his statement of material facts that are not in dispute is full of legal argument and conclusions and not factual assertions supported by evidence in the record. See dkt. 111 at 7-11. In addition, many of the facts and exhibits attached to Muhammad's brief relate to treatment he received before or after his incarceration at FCI Terre Haute and are not relevant to establishing that the individual defendants are liable to Muhammad in this case.

Muhammad argues that his medical care providers have not done enough to treat his serious medical conditions. In particular, he takes issue with the fact that although he has received numerous evaluations and consultations he has not had necessary surgeries and treatments. He explains that his transfer from FCI Gilmer to FCI Terre Haute and then to the FCI Petersburg has inappropriately delayed his treatment. Dkt 135 at p. 11. But, the fact of these transfers is not evidence that any individual medical care provider was deliberately indifferent to Muhammad's serious medical needs.[8]

Muhammad has failed to come forward with sufficient facts to establish that any individual defendant is liable to him for violating his Eighth Amendment rights as a matter of law. Accordingly, his motion for summary judgment, dkt. [111] is **denied.**

---

[8] The Court notes that the claim against Counselor Gehrke, Operations Lt. Parker, Unit Manager Fortune and RN Scully for allegedly violating Muhammad's First Amendment rights by retaliating against him for filing grievances related to his medical treatment was addressed in *Muhammad v. Gehrke,* 2:15-cv-334-WTL-MJD (appeal pending USCA Case Number 18-1776). In that action, Muhammad alleged that the defendant BOP employees retaliated against him by threatening him with physical assault, 24-hour single-cell detention, and transfer to another facility if he persisted in filing grievances or medical requests.

**B. Federal Defendants' Motion for Summary Judgment**

   *1. Public Health Service Employees – Klink and Blilia*

   Klink and Blila argue that as Active Duty Commissioned Officers in the United States Public Health Service, they are entitled to absolute immunity. Muhammad argues in response that they were not "doing the business of their employer." Dkt. 135 at p. 28. Instead, they were doing the business of the Bureau of Prisons.

   Officers and employees of the Public Health Service are immune from civil suit for damages for personal injury based on the "performance of medical, surgical, dental, or related functions." 42 U.S.C. § 233(a). The exclusive remedy for these actions lies in the Federal Tort Claims Act ("FTCA"). *Id.; see also Hui v. Castenda*, 599 U.S. 799, 802, 812 (2010) (stating that "[s]ection 233(a) grants absolute immunity to PHS officers and employees for actions arising out of the performance of medical or related functions within the scope of their employment by barring all actions against them for such conduct" and concluding that "[t]he immunity provided by § 233(a) precludes *Bivens* actions against individual PHS officers or employees for harms arising out of conduct described in that section"); *Carlson v. Green*, 446 U.S. 14, 20 (1980) (citing § 233(a) and stating that "Congress follows the practice of explicitly stating when it means to make FTCA an exclusive remedy"). This is true even if the allegations are not for medical malpractice. *See Cuoco v. Moritsugu*, 222 F.3d 99, 108 (2d Cir. 2000) (stating that "there is nothing in the language of § 233(a) to support th[e] conclusion [that § 233(a) provides immunity only from

medical malpractice claims]" because "[w]hen Congress has sought to limit immunity to medical malpractice claims it has done so explicitly").[9]

Klink and Blilia are entitled to judgment as a matter of law. This is because from November 20, 2012 through October 21, 2013 both AHSA Klink and FNP Blila were PHS employees. As part of their employment with PHS, they were stationed at FCC Terre Haute. All actions that Klink or Blila allegedly took with respect to Muhammad were undertaken within the scope of their employment. Because the allegations against them arise out of the performance of their duties as an officer of the PHS, they are entitled to the protection of § 233(a). See 42 U.S.C. § 233(a) (providing immunity from damages for personal injury based on the "performance of medical, surgical, dental or **related** functions" (emphasis added)).

Accordingly, Muhammad's claims against both Klink and Blila are barred as a matter of law and they are entitled to summary judgment in their favor.

### 2. Statute of Limitations – Rupska, Bailey and Atterbury

Rupska, Bailey and Atterbury argue that they are entitled to judgment as a matter of law because the claims alleged against them are barred by the statute of limitations. Muhammad disputes this conclusion arguing that he is entitled to equitable tolling because he could not file suit until after he exhausted his administrative remedies.

Muhammad has sued the federal defendants under the *Bivens* doctrine, which allows suits against federal employees for violations of constitutional rights. *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). The statute of limitations in a

---

[9] The Court notes that Muhammad's FTCA claim against the United States was denied because Muhammad failed to exhaust his administrative remedies prior to filing this action. See dkt 88.

*Bivens* claim is the same as that for a claim brought pursuant to 42 U.S.C. § 1983. *See Lewellen v. Morely*, 875 F.2d 118, 119 (7th Cir. 1989); *Bieneman v. City of Chicago*, 864 F.2d 463, 469 (7th Cir. 1988). In these cases, "federal courts apply the statute of limitations governing personal injury actions in the state where the injury took place." *Serino v. Hensley*, 735 F.3d 588, 590 (7th Cir. 2013). In Indiana, such claims must be brought within two years. Ind. Code § 34-11-2-4. *Richards v. Mitcheff*, 549 Fed.Appx. 572 (7th Cir. 2014) ("federal law under 42 U.S.C. § 1988 absorbs both the period of limitations from state law and the corresponding tolling rules.").

Federal law, however, determines when that statute begins to run. *Bivens* and § 1983 claims "accrue when the plaintiff knows or should know that his or her constitutional rights have been violated." *Savory v. Lyons*, 469 F.3d 667, 672 (7th Cir. 2006). The Court conducts a two-part inquiry to determine when this standard is met: "First, a court must identify the injury. Next, it must determine the date on which the plaintiff could have sued for that injury." *Id.*

The defendants argue that because Muhammad did not file suit until July 27, 2015, any allegations arising out of incidents that occurred before July 27, 2013, are time-barred. As to Rupska, his only involvement in Muhammad's care occurred on or around November 29, 2012, when he responded to an electronic message that Muhammad sent, seeking information as to how and when his serious medical needs would be addressed. Dr. Thomas Bailey evaluated Muhammad twice, on December 3, 2012, and May 28, 2013. Finally, HSA Atterbury responded to an electronic message regarding Muhammad's request for medical shoes and a mattress overlay in March 2013. It would therefore seem to follow that Rupska, Bailey, and Atterbury are entitled to summary judgment because all of their interactions with Muhammad relevant to the allegations in this action occurred before July 27, 2013.

Muhammad argues, however, that he is entitled to equitable tolling because he was not able to file suit until he exhausted his administrative remedies. He is mistaken. In *Johnson v. Rivera*, 272 F.3d 519, 521–22 (7th Cir.2001) the Seventh Circuit held that a federal court relying on the Illinois statute of limitations in a § 1983 case must toll the limitations period while a prisoner completes the administrative grievance process. This specific holding was based on Illinois law and is not applicable to this case which must apply Indiana law. In addition, the defendants point out that the record establishes that Muhammad exhausted his claims against Rupska, Bailey and Atterbury in 2013 and there is no explanation for his delay in bringing his exhausted claims.

Because Muhammad's interactions with Rupska, Bailey and Atterbury are well outside the two-year statute of limitations, the claims against these defendants are barred by the statute of limitations and they are entitled to judgment as a matter of law.

### 3. Personal Involvement – Miller

Muhammad alleges that Kayla Miller was deliberately indifferent to his serious medical need for orthopedic shoes to treat neuropathy and artery disease in his feet. Miller, a Health Service Assistant, seeks summary judgment on the basis that she was not personally responsible for any of the alleged misconduct. Muhammad argues in response that Miller knew he was being mistreated and failed to take appropriate action.

To be liable under *Bivens* requires personal responsibility for the misconduct alleged. *See Arnett v. Webster*, 658 F.3d 742, 757 (7th Cir. 2011) ("[A] defendant cannot be liable under *Bivens* on the basis of respondeat superior or supervisory liability, rather, there must be individual participation and involvement by the defendant."). In *Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009), the Supreme Court wrote that knowledge of a subordinate's misconduct is not enough. The

supervisor can be liable only if he wants the harmful conduct to occur. *Id*. at 677. But both *Iqbal* and *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009) hold that a supervisor is not liable just because a complaint is made and an effective solution is not forthcoming. *See Vance v. Rumsfeld,* 701 F.3d 193, 204 (7th Cir. 2012).

From November 2012 through October 2013, Miller was a Health Services Assistant. In this position, Miller did not treat Muhammad or make clinical decisions regarding what treatment was appropriate for him. Nor does Muhammad point to any evidence that reflects that Miller was responsible for delaying or obstructing Muhammad's access to care. Because Miller was not directly engaged in the provision of medical services, she was entitled to rely on the judgment of the BOP and outside medical professionals who provided Muhammad with medical care. *Arnett*, 658 F.3d at 755 ("Non-medical defendants … can rely on the expertise of medical personnel. We have previously stated that if a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."). Miller was not required to second-guess the judgment of the trained medical professionals supervising Muhammad's medical care. *Vance*, 701 F.3d 193, 203 (7th Cir. 2012) (holding that "a public official's inability to ensure that all subordinate federal employees follow the law has never justified personal liability"). Miller was not permitted to order the orthopedic shoes Muhammad wanted unless a clinician determined that the shoes were medically necessary and issued an order for their purchase. Muhammad argues that Miller knew he had a medical need for the shoes and that they were already prescribed. But Muhammad does not point to any admissible evidence that reflects that Miller was directed to order the shoes and that Miller delayed or ignored those orders.

There is no evidence to support a claim that Miller interfered with Muhammad's medical care or that she was responsible for the delay in providing custom shoes.

Because Miller did not directly participate in providing medical care to Muhammad, she cannot be held liable under *Bivens* and is entitled to summary judgment in his favor.

### 4. Deliberate Indifference to Serious Medical Needs – Tabor

Muhammad asserts an Eighth Amendment medical care claim against Timothy Tabor, a Physician Assistant. He argues that Tabor was deliberately indifferent to his need for treatment for hepatitis C, a torn rotator cuff in his shoulder, artery disease of his legs, damaged vertebrae in his neck and back, and orthopedic shoes. Tabor seeks summary judgment arguing that the evidence reflects that he was not deliberately indifferent to Muhammad's serious medical needs.

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

"[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner." *Board v. Freeman*, 394 F.3d 469, 478 (7th Cir. 2005). The Seventh Circuit tackled this issue in *Petties v. Carter*, writing:

> To determine if a prison official acted with deliberate indifference, we look into his or her subjective state of mind. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996) (*citing Farmer*, 511 U.S. at 842, 114 S.Ct. 1970). For a prison official's acts or omissions to constitute deliberate indifference, a plaintiff does not need to show that the official intended harm or believed that harm would occur. *Id.* at 992. But showing mere negligence is not enough. *Estelle*, 429 U.S. at 106, 97 S.Ct. 285 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) ("Deliberate indifference is not medical malpractice."). Even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it should be known—is insufficient to make out a claim. *Farmer*, 511 U.S. at 836–38, 114 S.Ct. 1970. Instead, the Supreme Court has instructed us that a plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm. *Id.* at 837, 114 S.Ct. 1970. Officials can avoid liability by proving they were unaware even of an obvious risk to inmate health or safety. *Id.* at 844, 114 S.Ct. 1970.

*Pettis v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). There is no doubt that this is a high standard for any plaintiff to meet. However, to survive summary judgment the plaintiff need not prove his case. Instead, the plaintiff is only required to present "evidence from which a reasonable jury could infer a doctor knew he was providing deficient treatment." *Id.* at 726.

For purposes of summary judgment, the parties do not dispute that Muhammad's hepatitis C, torn rotator cuff, artery disease, damaged vertebrae in his neck and back, and foot condition are serious medical conditions. Instead, they disagree as to whether Tabor was deliberately indifferent to these serious medical conditions. Tabor argues that he was not deliberately indifferent and that the care he provided was appropriate. Muhammad argues generally that his multiple medical issues were ignored by the defendants with deliberate indifference. Specifically, Muhammad claims that

he was denied treatment for a nonmedical reason due to arbitrary procedures and policies or malice. See dkt. 111 at p. 10-11.

     a.  Hepatitis C

With respect to Muhammad's hepatitis C, upon his initial evaluation of Muhammad in December 2012, Dr. Bailey noted this diagnosis, that Muhammad had been previously treated with interferon and ribavirin, but that it was considered a treatment failure, and that his liver enzymes were normal for the past three tests. Similarly, in January and February of 2013, Tabor took note of Muhammad's hepatitis C diagnosis, but informed him that he did not meet the treatment criteria according to his last liver biopsy. A liver ultrasound that was performed in January 2013 found no significant sonographic abnormality. In considering Muhammad's history of hepatitis C, Dr. Bailey noted this normal ultrasound—among other factors—when he evaluated Muhammad again in May 2013. All of these interactions noted above occurred more than two years before Muhammad commenced this action on July 27, 2015

Muhammad attempts to argue that "being monitored" in chronic care is not treatment consistent with community standards, but "it is deliberate indifference because due to numerous commercials about Hep-C even laypeople know and understand that it is an extremely deadly disease." Dkt. 111 at 15. Such unsupported speculation and generalizations, however, are insufficient to establish that Tabor or any of the particular defendants were deliberately indifferent to Muhammad's hepatitis C.

Rather, as Dr. Baldea, the Federal Defendants' expert concluded the conservative treatment of Muhammad's hepatitis C by the BOP medical professionals was reasonable, appropriate, and within the standard of care.

### b. Torn Rotator Cuff

Regarding Muhammad's claims arising from his torn rotator cuff, on February 22, 2013, PA Tabor submitted a radiology consultation request for an MRI of his right shoulder, noting Muhammad's pain, limited range of motion, and prior treatment. The URC approved the request later that month, and the MRI was performed on April 15, 2013. PA Tabor did not treat Muhammad after this date. Defendant's expert witness, Dr. Baldea found the treatment Muhammad received for his right shoulder pain and rotator cuff tear to be appropriate, reasonable, and within the standard of care.

### c. Artery Disease

Dr. Baldea testified that the treatment Muhammad received for his peripheral vascular disease was appropriate, reasonable, and within the standard of care. Dr. Baldea noted that Muhammad was provided numerous forms of conservative therapy for his peripheral vascular disease, including instructions to lose weight and increase activity, and compression stockings that were used intermittently and replaced on a regular basis.

As relevant to the allegations here, Muhammad was evaluated by cardiology on October 7, 2013, and had an ABI test performed, with a note made to consider an MRA or CTA of his lower extremities. PA Tabor submitted several requests to have Muhammad seen by cardiology for various treatment, including cardiac stress tests and follow-up appointments. See, e.g., Dkt. 116-10 (January 7, 2013) (Tabor sought cardiology consultation); Dkt. 116-17 (February 22, 2013) (Tabor conducted post-procedure follow up at health services with Muhammad to discuss normal results of MRA study); Dkt. 116-23 (March 11, 2013) (Tabor made a new request for an in house cardiology consultation to discuss Muhammad's February 26, 2013, stress test); Dkt. 116-26 (April

10, 2013) (Tabor had an appointment with Muhammad to discuss low back pain. MRI was pending, requested a physical therapy consultation to evaluate Muhammad's need for medical shoes).

Muhammad insists that "defendant(s) herein named were unequivocally cognizant of the fact that Plaintiff suffered from [Peripheral Vascular Disease] PVD, sought treatment for it on numerous occasions, but nothing was done about it or the pain" and cites to incomplete medical records that he contends show that "staff knew about Plaintiff's disease but chose to do nothing about it." Dkt. 111 at 21. But, to survive summary judgment, Muhammad cannot simply make blanket assertions that unspecified "defendant(s)" or "staff" knew about his vascular disease and did nothing. Without any evidence that Tabor was deliberately indifferent to his serious medical need, Tabor is entitled to judgment as a matter of law.

d. Damaged Vertebrae

Muhammad underwent lumbar spine x-rays on March 12, 2013, following a fall from his bunk, and an MRI of his lumbar spine on April 15, 2013. He was later seen by neurosurgeon Dr. Narotam, who recommended L2-S1 transfacet fixation surgery. It was PA Tabor who re-submitted the consultation request for an MRI of Muhammad's lumbar spine on February 22, 2013, noting that it was previously approved by region in July 2012. Dkt. 116-15. Dr. Bailey then submitted the consultation request to have Muhammad seen by a neurosurgeon for his disc disease on May 23, 2013. Dkt. 116-33. Dr. Baldea opined that the medical care provided to Muhammad for his lumbar spine degenerative joint disease and spine pain was appropriate, reasonable, and within the standard of care. Tabor is entitled to summary judgment as to this claim.

e. Medical Shoes

Finally, regarding the provision of medical shoes to Muhammad, Muhammad previously claimed that Defendant Matchett, who has separately moved for summary judgment, was responsible for denying him medical shoes. To the extent that Muhammad is now arguing that the Federal Defendants are liable, the records reflect that PA Tabor submitted a consultation request to have Muhammad seen by physical therapy for an evaluation of his need for medical shoes, which the URC approved. PT Matchett then conducted that evaluation.

Subsequently, it was determined that Muhammad's current medical conditions did not meet the requirements for medical shoes. Although Miller and Atterbury, Health Services Assistants whom Muhammad contends denied him medical shoes, are responsible for ordering medical supplies, they can only do so once a physician has deemed those supplies medical necessary.

After Muhammad continued to complain about medical shoes, PA Tabor submitted a consultation request for podiatry to have him scheduled for a LEAP foot exam and evaluation of bilateral foot neuropathy, and for "Specialty Procedure - In house" to have him scheduled for a bilateral ABI. In particular, Tabor gave a detailed reason for his request. He wrote:

> Schedule this care level 2 inmate for LEAP foot exam and evaluation of bilateral foot neuropathy. Has been denied medical shoes at this facility but does not appear to have had LEAP foot exam. Per BOP policy, "Occasionally, custom shoes or orthotic devices may be medically necessary to accommodate a significant foot deformity or to decrease the chance of injury to feet with impaired sensation. P6031.03 of 8/23/2012 pg 51.

Dkt. 116-39 (August 13, 2013). The detail and citation to policy reflect that Tabor was trying to assist Muhammad in receiving the evaluation he needed. On October 3, 2013, Muhammad was subsequently re-evaluated by PT Matchett, who determine that Muhammad had some risk factors

for skin ulceration so medical shoes appeared indicated. Dkt. 116-50. Before Muhammad could receive new custom shoes, he was transferred to another facility on October 21, 2013. Dr. Baldea opined that the duration and frequency in which custom orthopedic medical shoes were supplied to Muhammad complied with the standard of medical care.

The defendants argue that Tabor is entitled to judgment as a matter of law because when responding to Muhammad's complaints, Tabor evaluated Muhammad's conditions, prescribed him treatment and submitted appropriate consultation requests. There are no disputed questions of fact which could support a finding that Tabor is liable to Muhammad for violating his Eighth Amendment right to constitutionally adequate medical care. The evidentiary record in this case shows that Muhammad received constitutionally adequate care and that Tabor is entitled to judgment as a matter of law on this basis.

### 5. Qualified Immunity

The federal defendants argue that even if they are found to have violated Muhammad's Eighth Amendment rights, they are entitled to qualified immunity. "Qualified immunity protects officers performing discretionary functions from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights that a reasonable person would know about." *Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir. 2006) (*citing Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Analysis of the qualified immunity defense requires a consideration of: (1) whether the plaintiff's constitutional rights were violated and (2) whether the right clearly established at the time. *Id.*

The defendants argue that they acted reasonably and that it would not have been clear that they were required to pursue a different, or more aggressive, course of treatment.

For the reasons explained above, however, the defendants are not liable for violating Muhammad's constitutional rights. Nor is there evidence upon which a reasonable trier of fact could conclude that Muhammad's Eighth Amendment rights were violated. Accordingly, a qualified immunity defense is irrelevant and need not be considered further. *Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1057–58 (7th Cir. 2011).

## IV. Conclusion

Accordingly, the federal defendants' motion for summary judgment, dkt [116], is **granted** and Muhammad's motion for summary judgment, dkt [111], is **denied.**

This Entry resolves all claims against all remaining parties. Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 6/26/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

ABDUL-AZIZ RASHID MUHAMMAD
20017-101
ROCHESTER - FMC
ROCHESTER FEDERAL MEDICAL CENTER
Inmate Mail/Parcels
P.O. BOX 4000
ROCHESTER, MN 55903

Carol A. Dillon
BLEEKE DILLON CRANDALL, P.C.
carol@bleekedilloncrandall.com

Gina M. Shields
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
Gina.Shields@usdoj.gov